UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JULIE SIEVEKING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No. 4:07 CV 986 DDN |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Julie Sieveking for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act (Act), 42 U.S.C. §§ 401, et seq., and 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 8.) For the reasons set forth below, the ALJ's decision is reversed and remanded.

**I.  BACKGROUND**

Plaintiff Julie Sieveking filed two applications under the Act, a July 12, 2005 application for disability insurance benefits under Title II (Tr. 54-58), and a July 19, 2005 application for supplemental security income (SSI) under Title XVI.[1] Sieveking alleged an onset date of disability of June 15, 1994. (Tr. 54-56, 93-95.) The claim was denied (Tr. 43-48). Sieveking requested a hearing, appealing directly to the

---

[1]The Supplemental Security Income application is not included in the transcript.

ALJ.[2]  (Tr. 42.)  Sieveking amended her applications to allege an onset date of disability of March 31, 1999.  (Tr. 297.)

On August 11, 2006, following a hearing, the ALJ found Sieveking not disabled.  (Tr. 9-20.)  Sieveking requested review by the Appeals Council.  (Tr. 7.)  On March 23, 2007, the Appeals Council denied her request for review.  (Tr. 3-5.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

Sieveking is 45 years old (Tr. 21), and has a high school education. (Tr. 281.)  Grace Theodora, M.D., a psychiatrist, initially treated Sieveking until her retirement in 2002.  (Tr. 219.)

On June 16, 2003, after Theodora's retirement, Sieveking began seeing Howard Ilivicky, M.D., a psychiatrist, for major depression (recurrent, severe) and binge-eating disorder.  (Tr. 209-221, 251-270.) Throughout the course of Sieveking's treatment, Ilivicky adjusted her medication.  (Tr. 209-221, 256-270.)  At the time of her hearing, Sieveking was taking Xanax (80 m.g. for anxiety), Prozac (80 m.g. for depression) and Trazadone (300 m.g. for depression).  (Tr. 60.)

On April 25, 2006, Ilivicky completed a mental medical source statement, rating Sieveking as extremely or markedly limited in 12 basic work-related areas of functioning.  (Tr. 251-254.)  He noted that Sieveking had suffered from four or more episodes of decompensation in the past year.  (Tr. 253.)  Ilivicky found that Sieveking had suffered a substantial loss of four basic work-related abilities.  Id.  Ilivicky assigned Sieveking a GAF score of 35.[3]  (Tr. 254.)  He noted that

---

[2]Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case.  20 C.F.R. §§ 404.906, 404.966, 416.1406, 416.1466 (2007). These modifications include, among other things, the elimination of the reconsideration step.  See id.

[3]A GAF of 31-40 is defined as having some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed
(continued...)

-2-

Sieveking's lowest GAF score was 30 during the past year and concluded that she had probably been limited in that way since 1989. (Tr. 253.)

On August 16, 2005, at defendant's request, Sieveking underwent a psychological evaluation with Georgia Jones, M.D. (Tr. 203-206.) Jones observed:

> [d]irect mental status revealed a woman who was very tall, very heavy, wore a sleeveless, black dress. Her psoriasis was obvious. There was significant male pattern balding and facial hair apparent and excessive body hair. She was sad and blue with overt tearfulness at times, downcast eyes, walked slowly and painfully.

(Tr. 204.) Jones concluded that Sieveking's concentration, persistence and pace were diminished, and that her appearance and ability to care for her personal needs was poor. (Tr. 206.) Jones diagnosed Sieveking with major affective disorder (depression, recurrent, severe) and assigned her a GAF of 50.[4] Id.

In November 2002, Susan Reeds, M.D. began treating Sieveking for severe psoriasis with psoriatic arthritis, osteoarthritis, degenerative disc disease with chronic back pain, nephrolithiasis (presence of renal/kidney calculi), recurrent major depression, panic disorder with agoraphobia, polycystic ovary syndrome with androgen excess, impaired glucose tolerance, and morbid obesity. (Tr. 226-249.) During a November 13, 2002 visit, Reeds noted Sieveking's anxiety, depression, and psoriasis. (Tr. 238-239.) On May 19, 2003, testing conducted at Reeds's request showed a high level of testosterone. (Tr. 242-43.) An August 18, 2003 radiology report revealed degenerative changes of her thoracic spine. (Tr. 248.) Reeds adjusted Sieveking's medications throughout the

---

[3](...continued)
man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). Diagnostic and Statistical Manual of Mental Disorders (4th ed., Text Revision 2000) (DSM-IV-TR), 34.

[4]A GAF of 41-50 is defined as serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR, 34.

course of her treatment. (Tr. 226-249.) At the time of the hearing, Sieveking was taking Flexeril (as needed for pain) and Percocet (22.5 m.g. for pain). (Tr. 60.)

On February 10, 2006, Reeds completed a medical source statement detailing Sieveking's physical limitations. (Tr. 226-229.) Reeds noted that Sieveking was limited to sitting for a total of six hours during an eight-hour workday with the added limitation that she could not sit in one position for an extended period of time. (Tr. 226.) Reeds further noted that Sieveking was limited to standing for one hour and walking for thirty minutes during an eight-hour workday. Id. Reeds opined that Sieveking could occasionally lift and carry ten pounds, and that she could never lift or carry twenty or more pounds. (Tr. 227.) She noted that Sieveking could have significant manipulative limitations with both of her hands upon arthritic flare-ups, and that she could never stoop. (Tr. 227-28.) Reeds observed that Siveking was in constant pain due to her impairments and that her pain had resulted in muscle spasms, muscle tenderness, complaints of pain, weight gain, grimaces, sleeplessness, and irritability. Id. Reeds opined that Sieveking was further limited in that she would require a nap and/or the ability to lie down during an eight-hour workday, as well as hourly breaks due to her physical impairments. (Tr. 229.)

In 2003 and 2004 Sieveking saw Kendall Itoku, M.D. to remove kidney stones. (Tr. 143-187.) An April 15, 2003 radiology report revealed degenerative change with osteophytes (a bony outgrowth or proturbence) at multiple levels of Sieveking's spine and degenerative disc disease at L5-S1. (Tr. 179.) A January 31, 2004 radiology report revealed marked lateral osteophytosis of the lumbar spine. (Tr. 162.)

On August 16, 2005, at defendant's request, Sieveking saw Clodualdo A. Gamez, M.D. for a consultative examination. (Tr. 197-202.) Sieveking was five feet eight inches tall and weighed 465 pounds. (Tr. 198.) Gamez observed that Sieveking took very small steps, and did so very slowly while dragging her feet. (Tr. 202.) Gamez's impression was "an overall decline in her overall health due to psoriatic arthritis and osteoarthritis." (Tr. 199.)

**Testimony at the Hearing**

A hearing was conducted on May 2, 2006. (Tr. 277-299.) Sieveking testified that she had a high school education and some training in dental hygienist work. (Tr. 281.) She testified that she had previously worked as a cashier, records clerk, medical assistant, and customer service representative. (Tr. 283-284.) She testified that she suffered from depression, osteoarthritis, psoriatic arthritis, and psoriasis. (Tr. 284.) Sieveking testified that she was treated for her physical impairments by Dr. Reeds, whom she saw regularly once she had been approved for Medicaid, and whom she previously saw only sporadically because she could not afford to. (Tr. 284.) Sieveking testified that Reeds prescribed her psychiatric medications for a period of time, including an anti-depressant, while she looked for a new psychiatrist following Theodora's retirement. Id.

Sieveking testified that in 2003 she found a new psychiatrist, Dr. Ilivicky. (Tr. 285.) She testified that she sometimes had difficulty seeing Ilivicky regularly due to her finances and health. (Tr. 294.) She testified that she had pain all over her body (Tr. 284), which limited her ability to do everything, and that she took Percocet for the pain. (Tr. 287-88.) She testified that the Percocet helped to take the edge off the pain, but did not rid her of it completely. Id. Sieveking testified that her psoriasis made her entire body itch and that it was uncomfortable. (Tr. 289.) She testified that she could not sit or lay because of her pain and psoriasis, specifically she could not sit for more than thirty minutes at a time, after which time she needed to stand and readjust. (Tr. 289-90.) She testified that over the course of an eight-hour day she could sit for no more than an hour or two; that due to water retention she needed to sit in a recliner to keep her feet elevated; and that she could not walk or stand for long periods of time, including long enough to shower. (Tr. 289-90.)

Sieveking testified that she could stand for about two minutes before needing to sit; that she could walk approximately twenty feet before needing to stop; that on her walk from her car to the hearing office, she was forced to walk slowly before being out of breath; and that she needed to sit down once inside the hearing office. (Tr. 291-92.)

-5-

She testified that she could lift approximately eight pounds. (Tr. 291-292.)

Sieveking testified that she was limited in her daily activities, and that her husband did the grocery shopping and cooking. (Tr. 292-296.) She testified that she usually rises at 7 a.m. to help her son get off to school, and then goes back to bed from 11 a.m. to 1 p.m. (Tr. 295.) She testified that when she is able to do house cleaning, she can do so only a little at a time. Id.

The ALJ did not receive testimony from a vocational expert.

### III. DECISION OF THE ALJ

On August 11, 2006, the ALJ issued an unfavorable decision. (Tr. 9-20.) The ALJ found that Sieveking had not performed substantial gainful activity since her alleged onset date. (Tr. 18.) The ALJ found that Sieveking suffered from obesity, depression, psoriasis, psoriatic arthritis, degenerative changes of the thoracic spine, nephrolithiasis, anxiety, polycystic ovary syndrome with androgen excess and impaired glucose tolerance, the combination of which was "severe." (Tr. 13, 18.)

The ALJ found Sieveking had the residual functional capacity (RFC) to lift and carry ten pounds; frequently lift and carry less than ten pounds; sit six hours during an eight-hour workday; stand/walk two hours in an eight-hour workday; occasionally stoop and crouch; and push/pull consistent with her lifting limitations. During the course of the workday, Sieveking would need to slightly elevate her leg, but not so high as to interfere with her ability to perform work activities or to present an image that she is not actively working. The ALJ found that due to her mental impairments, Sieveking might have difficulty performing complex work, but there was no credible evidence she would be unable to perform the basic mental demands of competitive work on a sustained basis. The ALJ found that she had the ability to understand, carry out, and remember simple instructions; respond appropriately to supervisors, co-workers, and usual work situations; deal with changes in a routine work setting; and make judgments commensurate with functions of unskilled work. (Tr. 17-18, 19.)

The ALJ found Sieveking to have mild restrictions of activities of daily living; mild difficulties maintaining social functioning; and moderate difficulties maintaining concentration, persistence, and pace. (Tr. 18, 19.) The ALJ found she was unable to perform her past relevant work. Id.

The ALJ found Sieveking's testimony about her inability to work not completely credible. (Tr. 17.) The ALJ specifically found that Sieveking's allegations of disability were not supported by her relatively limited history of medical treatment. (Tr. 16.) The ALJ noted that although Sieveking stated she became disabled as of March 31, 1999, she testified that she did not see a doctor until approximately 2002, and that her file contained no records prior to 2003. (Tr. 1, 16, 286.) The ALJ noted she had had no surgeries, physical therapy, chiropractic or pain clinic treatments, nor was there any evidence of emergency room visits, hospitalizations, or injections for pain relief. (Tr. 16.) The ALJ noted that with respect to her mental impairments, there were no recent psychiatric hospitalizations, nor had she been treated regularly by a psychologist, psychiatrist, or other mental health professional. (Tr. 16.)

The ALJ noted that Sieveking's use of medications did not suggest that her impairments were more limiting than those found by the ALJ. (Tr. 16.) The ALJ noted that although Sieveking submitted a summary of her medications, she testified that she saw Dr. Ilivicky only twice yearly to monitor her medications (Tr. 64, 294), that there were no side effects alleged in any treatment notes, nor did Sieveking allege any. (Tr. 16.)

The ALJ found that Sieveking's sporadic work history was not a positive factor in assessing her credibility. (Tr. 17.) The ALJ noted that Sieveking's earnings record indicated that from 1980 through 1994, she only had five years where she earned more than $5000; that she had six years where she earned less than $3000; and although Sieveking alleged she became disabled in 1999, she had not reported any income since 1995. (Tr. 52.)

Another factor observed by the ALJ was Sieveking's unpersuasive appearance and demeanor while testifying at the hearing. (Tr. 17.) The

-7-

ALJ observed that Sieveking displayed no evidence of pain or discomfort, and had no apparent difficulty understanding or responding to questions posed to her. Id.

Finally, the ALJ noted inconsistencies in Sieveking's testimony. (Tr. 16). The ALJ noted Sieveking stated that she must care for her husband and son, both of whom are disabled, but also stated that her husband must care for her. (Tr. 16, 103, 292.) She noted that Sieveking testified she could not do grocery shopping, but subsequently stated that she could do so. (Tr. 292.) The ALJ found Sieveking was not disabled at step five of the sequential analysis based on Medical-Vocational Rule 201.27. (Tr. 19.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner

finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

## V. DISCUSSION

Sieveking argues the ALJ erred by: 1) failing to call a vocational expert regarding her significant nonexertional limitations and by instead relying on the Medical-Vocational Rules (the "grids"); and (2) determining her RFC without reference to the record evidence.

**A. Vocational Expert**

The ALJ found Sieveking to have both severe exertional and nonexertional impairments, noting the combination of her obesity, depression, psoriasis, psoriatic arthritis, degenerative changes of the thoracic spine, nephrolithiasis, anxiety, polycystic ovary syndrome with androgen excess and impaired glucose tolerance to be severe. (Tr. 15, 18, 19.) The ALJ then found Sieveking not disabled at step five of the sequential evaluation. (Tr. 18, 19.)

Step five requires a finding that a plaintiff can do other work. 20 C.F.R. § 404.1505(a). At this step, defendant has the burden of proof. Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006), citing 20 C.F.R. § 404.1560 (c). To satisfy this burden, defendant must normally elicit testimony from a vocational expert. Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). A narrow exception to this rule exists when a claimant is limited to exclusively exertional impairments. Haley v. Massanari, 258 F.3d 742, 747-48 (8th Cir. 2001). In such a case, defendant may rely upon the Medical-Vocational Rules, or the Grids, a series of tables provided in 20 C.F.R. Appendix 2 to Subpart P of Part 404.

In the Eighth Circuit, a denial of benefits at step five for a claimant who suffers from exertional and nonexertional impairments must be based on the testimony of a vocational expert, unless the nonexertional impairments do not significantly diminish the claimant's RFC. Draper v. Barnhart, 425 F.3d 1127, 1131-1132 (8th Cir. 2005); Groeper v. Sullivan, 932 F.2d 1234, 1235 n.1 (8th Cir. 1991).

-9-

Nonexertional limitations are those that affect a claimant's ability to meet the demands of jobs other than the strength demands, that is demands other than sitting, walking, lifting, carrying, pushing or pulling. Burnside v. Apfel, 223 F.3d 840, 844 (8th Cir. 2000), quoting 20 C.F.R. § 404.1569(a). Nonexertional impairments can include hypertension, obesity, and pain. Evans v. Chater, 84 F.3d 1054, 1056 (8th Cir. 1996).

"Nonexertional capacity considers any work-related limitations and restrictions that are not exertional. Therefore, a nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional." SSR 96-9p, 1996 WL 374185, at * 5 (Soc. Sec. Admin. July 2, 1996).

Where the claimant has a nonexertional impairment, such as pain, the ALJ may not exclusively rely on the vocational grids to determine disability but must also consider the testimony of a vocational expert. Haley v. Massanari, 258 F.3d at 747-48; Vincent v. Apfel, 264 F.3d 767, 769 (8th Cir. 2001). Thus, the grid is only used when the components of the grid precisely match the characteristics of the claimant. Thompson v. Bowen, 850 F.2d 346, 349 (8th Cir. 1988).

The exception to the general rule is that the ALJ may rely exclusively on the guidelines even though there are nonexertional impairments if the ALJ finds, and the record supports the finding, that the nonexertional impairments do not *significantly* diminish the claimant's RFC to perform the full range of activities listed in the guidelines. Reed v. Sullivan, 988 F.2d 812, 816 (8th Cir. 1993)(emphasis in original).

In this context, "significant" refers to whether the claimant's nonexertional impairment or impairments preclude the claimant from engaging in the full range of activities listed in the Guidelines under the demands of day-to-day life. Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997). "Under this standard isolated occurrences will not preclude the use of the Guidelines, however persistent nonexertional impairments

which prevent the claimant from engaging in the full range of activities listed in the Guidelines will preclude the use of the Guidelines to direct a conclusion of disabled or not disabled." Id.

Here the SSA argues there is no indication that Sieveking could not perform the nonexertional demands of unskilled work at the sedentary level, noting that the ALJ found that because of Sieveking's mental limitations, Sieveking could not perform complex work, but that she did have the ability to perform the basic mental demands of competitive work. (Tr. 19.) The SSA notes she had the ability to understand, carry out, and remember simple instructions; respond appropriately to supervisors, co-workers, and usual work situations; and deal with changes in a routine setting and make judgments commensurate with functions of unskilled work. The SSA argues Sieveking's nonexertional impairments did not diminish her ability to perform unskilled sedentary work, and therefore the ALJ properly found that a finding of not disabled was proper based on the guidelines for sedentary work, and Sieveking's age, education, and transferable work skills. (Tr. 19.) See 20 C.F.R. pt. 404, subpt. P, app. 2, Rule 201.27 (2007).

Sieveking replies that the ALJ specifically found as part of her RFC assessment that she had limitations in her abilities to stoop, crouch, and engage in complex work, and that she would need to elevate her leg during the workday. (Tr. at 18, 20.) She notes that 20 C.F.R. § 404.1569a specifically lists both difficulty understanding or remembering detailed instructions, and difficulty stooping or crouching, as examples of nonexertional impairments. Sieveking notes that the ALJ found that she could follow "simple instructions," but that she could not perform "complex work" (Tr. 17-18, 19), and that the ALJ did not make a finding regarding understanding or remembering detailed instructions.

Title 20 C.F.R. §§ 404.1545(a), 416.945(a) state that an RFC is the "most" a claimant can do despite his or her limitations. Therefore, Sieveking could follow simple instructions at most. The ALJ did not find these limitations isolated or temporary, but included them in her RFC assessment. (Tr. 17-18, 19.) Cf., 850 F.2d 346 (8th Cir. 1988) (reversing and remanding because the ALJ erred by relying upon the grids; an isolated headache or temporary disability will not preclude the use

-11-

of the Guidelines whereas persistent migraine headaches may be sufficient to require more than the Guidelines to sustain the Secretary's burden).

Because the ALJ included Sieveking's limitations on crouching and stooping, on avoiding complex work, as well as the requirement that she have the ability to elevate her leg in Sieveking's RFC, these nonexertional limitations passed the threshold test of significance, thus requiring the need for testimony from a vocational expert. Therefore, this court concludes the ALJ erred in relying solely on grid rule 201.27 when her findings precluded application of the rule and required testimony of a vocational expert. Cf., Wiley v. Apfel, 171 F.3d 1190, 1191 (8th Cir. 1999) (remanding to ALJ to restate the hypothetical correctly to the vocational expert; where claimant suffered from nonexertional limitations of inability to stoop, crouch or kneel, further vocational testimony was required to determine what jobs claimant could perform, as these limitations did not closely match those set forth in the grid rules).

**B.   Residual Functional Capacity (RFC)**

The ALJ found that Sieveking had the RFC to occasionally lift and carry ten pounds; frequently lift and carry less than ten pounds; sit six hours in an eight-hour workday; stand/walk two hours in an eight-hour workday; occasionally stoop and crouch; and push/pull consistent with her lifting limitations. The ALJ found that during the course of a workday, she would need to slightly elevate her leg, but not so high as to interfere with her ability to perform work activities; have difficulty performing complex work, but could understand, carry out, and remember simple instructions; respond appropriately to supervisors, co-workers, and usual work situations; deal with changes in a routine work setting; and make judgments commensurate with the functions of unskilled work. (Tr. 19).

Sieveking argues that the ALJ erred by determining her RFC without reference to the record evidence, and therefore the ALJ's assessed RFC is not supported by substantial evidence. Specifically, she argues that no medical evidence supports the ALJ's RFC assessment; that the ALJ did not cite, or provide a narrative discussion as to the evidence supporting

her RFC assessment; and that the ALJ did not explain how she arrived at the six hour and ten pound figures.

In support of its position, the SSA notes that although the ALJ's finding that Dr. Ilivicky's opinion that Sieveking was extremely and markedly limited in twelve basic work-related areas of functioning was supportive of her disability (Tr. 251-52), Ilivicky's opinion was not entitled to substantial weight because it relied heavily upon Sieveking's subjective report of symptoms and limitations, which the ALJ found not entirely credible. (Tr. 15.) The SSA argues that although Dr. Ilivicky treated Sieveking, his treatment was sporadic, consisting only of twice yearly visits to prescribe medications. (Tr. 294.) The SSA also notes the ALJ found that most of Ilivicky's opinions were conclusory, with little explanation of the evidence relied upon in forming his opinion, and that the infrequent treatment, along with Ilivicky's own notes, was not consistent with the type of marked and extreme limitations Ilivicky described. (Tr. 15).

RFC is a medical question and the ALJ's assessment of RFC must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001), citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d at 451. RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations. Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001), citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); 20 C.F.R. § 416.945(a). While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704. Defendant has the burden of proof for an assessment of RFC that will be used to prove that a claimant can perform other jobs in the national economy. Nevland v. Apfel, 204 F.3d at 857.

An "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at * 7 (Soc. Sec.

Admin. July 2, 1996). RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. Id.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the opinion should be given controlling weight. Id. A treating physician's opinions must be considered along with the evidence as a whole, and when a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight. See id.; Sampson v. Apfel, 165 F.3d 616, 618 (8th Cir. 1999). Thus, if other medical assessments are supported by superior medical evidence, the ALJ may discount the opinion of the treating physician. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). However, the ALJ may not discredit a claimant solely because her subjective complaints are not fully supported by objective medical evidence. Ramirez v. Barnhart, 292 F.3d 576, 580-82 (8th Cir. 2002).

Here the medical record evidence undermines the ALJ's assessed RFC. (Tr. 138-270.) Sieveking's treating psychiatrist, Dr. Ilivicky, and her treating physician, Dr. Reeds, found Sieveking to have numerous additional functional limitations. (Tr. 251-254, 226-229.) The ALJ discredited both doctors' opinions, finding their opinions were without substantial support from the other record evidence. (Tr. 15.) However, the ALJ did not cite any medical evidence in the record conflicting with the opinions of Drs. Ilivicky and Reeds. (Tr. 9-20.) Dr. Ilivicky's records show GAF scores 40 or below, consistent with the limitations he found. (Tr. 209-221, 251-270.) Dr. Jones assigned Sieveking a GAF score of 50, consistent with the limitations found by Dr. Ilivicky. (Tr. 206.) Dr. Reeds's records show testing indicating high levels of testosterone and degenerative changes of the thoracic spine. (Tr. 242, 248.) Dr. Gamez noted an overall decline in Sieveking's health. (Tr. 199.) Dr. Itoku's records show osteophytes and degenerative disc disease. (Tr.

-14-

179.)  Thus, the opinions of Drs. Ilivicky and Reeds are consistent with the record evidence as a whole, including the opinions of Georgia Jones, Ph.D., and Drs. Itoku and Gamez.  Based on the above, this court concludes the ALJ's failure to explain her assessment of Sieveking's RFC with references to specific evidence is reversible error.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded under Sentence Four of 42 U.S.C. § 405(g).  Upon remand, the ALJ should call a vocational expert to testify regarding what jobs could be performed by an individual with plaintiff's specific limitations.  The ALJ should also explain her assessment of Sieveking's RFC with references to specific evidence in the record.

An appropriate judgment order is issued herewith.


　　　　　　　　　　　　　　　　　　/S/   David D. Noce    
　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**


Signed on September 2, 2008.